Frank **CATANZARO**, Respondent,

v.

**John J. McKAY and Bart McKay,**
Appellants.

**No. 44371.**

Supreme Court of Missouri.

Division No. 1.

March 14, 1955.

Motion for Rehearing or to Transfer to
Court en Banc Denied April 11, 1955.

Walther, Hecker, Walther & Barnard, George W. Cloyd, St. Louis, for appellants.

Lyng, MacLeod & Davidson, Russell N. MacLeod, St. Louis, for respondent.

COIL, Commissioner.

Respondent brought an action for $10,000 for alleged personal injuries and property damage which he averred resulted from a collision between his and appellants' automobiles. (The parties will be referred to as they were designated in the trial court.) Defendants, Bart McKay, owner and father of John McKay, the driver, had verdicts and judgments which were set aside on the ground that the trial court erred in giving an instruction. Defendants appealed from the order sustaining the motion for new trial and contend: that plaintiff failed to make a submissible humanitarian case (the sole negligence upon which the case went to the jury), that the trial court did not err in giving instructions and that, in any event, there was no submissible case against defendant Bart McKay.

The accident occurred in St. Louis at the intersection of Claxton, a 30-foot north and south street, and Lillian, a 35-foot east and west street. Plaintiff drove south on Claxton toward Lillian. Defendant John McKay drove his father's automobile east on Lillian toward Claxton. The front of defendants' automobile struck the right side of plaintiff's automobile under the circumstances to be described.

Plaintiff abandoned all allegations of primary negligence and submitted his

case under the humanitarian theory, hypothesizing the failure of the driver defendant to warn, slacken, and swerve. To determine whether there was evidence to support the hypothesis that after plaintiff was in a position of imminent peril, defendant driver, in the exercise of the highest degree of care, could have warned and slackened and swerved (or have done either or any of them) and thereby have avoided the collision, we review the evidence from a standpoint favorable to plaintiff and give him the benefit of any part of defendants' evidence favorable to him and not contradicted by plaintiff's own testimony or not contrary to plaintiff's fundamental theory of recovery. And we give plaintiff the benefit of all reasonable inferences from all the evidence and disregard all of defendants' evidence unfavorable to plaintiff. Ukman v. Hoover Motor Express Co., Mo. Sup., 269 S.W.2d 35, 37 [2]. The evidence, so reviewed, justifies this statement.

Plaintiff drove south on Claxton with the left side of his automobile one or two feet west of the center line, and the right side about seven feet east of the west curb line, and, as he approached Lillian, he reduced his speed from 25 to 20 miles per hour. When he reached a place 15 feet north of the north curb of Lillian, traveling at a speed of about 18 to 20 miles per hour, he looked to his right and saw defendants' automobile about 125 feet away traveling east. Plaintiff, looking to the front (south), proceeded at a constant speed and partially across the intersection at an average speed of about 17 miles per hour. When the front end of his automobile had reached a place six feet north of the south curb of Lillian, he heard the screech of brakes, glanced to his right, and saw defendants' car five or six feet away going 35 or 40 miles per hour directly toward him. Plaintiff's 4-door sedan was struck at the right middle center post, knocked southeast, and came to rest against the east curb of Claxton just south of the intersection. Defendants' automobile straddled the center line of Lillian as it approached Claxton and skid marks made by its tires were 20 to 25 feet long. A

picture exhibit showed that those skid marks turned sharply to the south just before or at impact. Defendant did not sound a horn.

Plaintiff testified that, going at the speed he was traveling as he entered and partially crossed the intersection, he could have stopped in 25 feet. Plaintiff's testimony as to various positions, speeds, and distances pertaining to his own automobile was definite, but he made it clear that his testimony with reference to positions, speeds, and distances of defendants' automobile consisted of estimates, and that defendants' automobile may have been closer to the intersection when he first saw it or may have been going faster at either time he estimated its speed.

Plaintiff's witness Francis Kinealy, walking eastwardly on the south side of Lillian one block west of Claxton, saw defendants' automobile pass another eastbound car one block west of Claxton. He said that when defendants' car had reached an alley, located about 125 feet west of Claxton, it was going 35 or 40 miles per hour, and thereafter "I couldn't say what speed he was hitting * * * I knew he was speeding, and then I took my eyes off of it momentarily and I heard the impact * * *."

Defendant John McKay testified that for the last 125 feet prior to the impact he traveled at a speed of 20–25 miles per hour and saw plaintiff's automobile when defendants' car was 25–30 feet from the intersection, at which time he applied his brakes.

Defendants contend that there was no substantial evidence from which a jury could find, without resort to guess and conjecture, that defendant driver in the exercise of the highest degree of care could have avoided the casualty by warning, slackening, and swerving. We cannot agree. Plaintiff saw defendants' car when it was 125 feet west of the collision point. At that time the front of plaintiff's car was 15 feet north of the north curb of Lillian. (There was testimony concerning obstructions at the northwest corner of the

intersection, but there was no question that defendant driver could have seen plaintiff when he was 15 feet north of the north curb of Lillian.) Plaintiff testified that he could stop in 25 feet. Thus, he traveled five feet from the place where he looked and saw defendants' automobile approaching until he reached a place 10 feet north of the north curb of Lillian, after passing which he could not stop short of the path of defendants' automobile as it proceeded eastwardly on Lillian straddling the center line (i. e., about 2½ feet of defendants' car was north of the center line). During the .2 of a second it took plaintiff to travel the five feet from the place of safety to a place of imminent peril, there were no reasonable appearances from which defendant should have believed that plaintiff, during that .2 of a second, had become oblivious of the danger from the approach of defendants' car. It is, therefore, clear that a jury reasonably could have found that plaintiff came into and was in a position of imminent peril when the front end of plaintiff's automobile was 10 feet north of the north curb of Lillian.

This is true, provided that when the front end of plaintiff's car was at the place 10 feet north of the north curb of Lillian, defendant was at a place and traveling at a speed which, if he continued, would result in a collision. Plaintiff testified that his car was 16 feet long. It follows that plaintiff, from the place 10 feet north of the north curb of Lillian, had to travel about 47 feet to be clear of defendant's path as defendant proceeded eastwardly on Lillian straddling the center line. To travel this 47 feet would take plaintiff slightly more than 1.8 seconds. Now, plaintiff's evidence was such that the jury reasonably could find from it that when plaintiff was 15 feet north of the north curb of Lillian (not in imminent peril), defendants' automobile was 125 feet to the west of the right side of plaintiff's car, traveling 40 miles per hour, and increasing speed. While plaintiff went the five feet (from the place 15 feet north of the north curb to the place 10 feet north of the north curb), defendant, at 40 miles per hour, went about

11 feet. The jury reasonably could find that during this time defendant increased his speed to about 43 miles per hour so that at the time plaintiff was 10 feet north of the north curb of Lillian defendant was traveling 43 miles per hour and was 113 feet away from the right side of plaintiff's car. In the 1.8 seconds it would have taken plaintiff to clear defendant's path, defendant would have traveled the 113 feet to the right side of plaintiff's car. So that it is apparent that the jury reasonably could find that plaintiff came into and was in imminent peril when the front of his automobile was 10 feet north of the north curb of Lillian. And, as we have seen, defendant then was traveling 43 miles per hour and was 113 feet away.

There was no direct evidence of reaction time, so that we shall notice defendant's reaction time as three fourths of a second. Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785. It was reasonable for the jury to conclude that defendant could have stopped any increase of speed during the three fourths of a second reaction time and could have been (by the end of reaction time) traveling at 43 miles per hour. In that event he would have traveled during the three fourths of a second about 47 feet. So that, after reaction time, the defendant could have been in the exercise of the highest degree of care, 66 feet and 1.05 seconds away from the right side of plaintiff's car. In that time at 43 miles per hour, defendant would have traveled not more than the 66 feet. Consequently, it is apparent that if defendant had slackened his speed at all plaintiff would have cleared defendant's path. And certainly it is obvious that any slackening and swerving would have avoided the collision. We think under the circumstances a jury reasonably could have found that if defendant, after plaintiff came into imminent peril, had decreased his speed instead of increasing it (as the jury could find he did), the collision would have been avoided. And indeed the evidence, viewed most favorably from plaintiff's standpoint, was that the defendant driver did not take any action when he was 66 feet away (after reaction

time). On the contrary, defendant driver testified that he did not see plaintiff until defendants' car was 25 feet west of the intersection. He applied his brakes at that time, which caused skid marks about 25 feet long, and, as noted, the skid marks were such that the jury could reasonably find that defendant swerved sharply to his right into the center of plaintiff's automobile. Thus, the jury reasonably could find that defendant driver, instead of taking action to avoid the collision when he was 66 feet away, continued to increase his speed until he was only 25 feet from the collision point.

■ All of which results in the conclusion that, under the evidence considered favorably to plaintiff, it may be demonstrated, without guess and conjecture, that the defendant driver, in the exercise of the highest degree of care, could have averted the casualty by slackening and swerving after he should have seen that plaintiff was in imminent peril. That conclusion precludes us from declaring as a matter of law that no submissible case was made. Ukman v. Hoover Motor Express Co., supra, 269 S.W.2d 39 [5].

We have not mentioned specifically the question of whether a submissible case was made on defendants' failure to warn. It seems apparent, however, on the facts, as heretofore analyzed, that it is not demonstrable that a warning, given after plaintiff's imminent peril and after defendant's reaction time, and in view of plaintiff's necessary reaction time thereafter, could have avoided the casualty.

As noted, the trial court sustained plaintiff's motion for a new trial on the ground that instruction 3 was erroneous. Instruction 3 was:

"The Court instructs the jury that under the law the driver of an automobile approaching an intersection has the right to assume that the driver of another automobile approaching the intersection from his left and at approximately the same time will yield the right of way, and the driver approaching from the right is under no duty to stop, swerve or slacken his speed until it becomes apparent to him, or should in the exercise of the highest degree of care become apparent to him that the other driver will fail to yield him the right of way.

"In this connection the Court instructs that if you find and believe from the evidence that on the occasion mentioned in evidence that as John McKay approached and entered the intersection of Claxton and Lillian Avenues, the automobile of plaintiff was approaching said intersection from his left at approximately the same time and distance, if you so find, then the Court instructs that John McKay had a right to assume that plaintiff would yield the right of way; and if you further find and believe from the evidence that at the time John McKay saw, or should have seen that plaintiff was proceeding on through the intersection and was in a situation of imminent peril of being struck and collided with his automobile, he was then so close to the automobile of plaintiff that he could not thereafter in the exercise of the highest degree of care have sounded a warning and swerved and slackened the speed of his automobile and thus and thereby have avoided the accident, if you so find, then the Court instructs you that the plaintiff is not entitled to recover of defendants and your verdict shall be in favor of defendants."

■ It seems to us apparent that the foregoing instruction is erroneous. This, for at least three reasons. First,—the instruction injects into a humanitarian case the contributory negligence of plaintiff, in that the instruction is so drawn that a jury probably would understand that if plaintiff's failure to yield the right of way was a contributing cause to his injury he could not recover. This was prejudicial error. Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 90, 85 S.W.2d 116, 123 [6–10]; Reiling v. Russell, 348 Mo. 279, 282, 283, 153 S.W.2d 6, 8 [1] [2]. See also: McCall v. Thompson, 348 Mo. 795, 804, 155 S.W.2d 161, 166, 167; Hangge v. Umbright, Mo. Sup., 119 S.W.2d 382, 384 [5, 6].

Second,—the portions of the instruction dealing with right of way had no place in this humanitarian case irrespective of the error above noted. Neither the abstract statement of the law of right of way (and we need not determine whether it was an accurate statement) nor the attempted application of that principle to the instant facts were appropriately mentioned in this so-called converse humanitarian instruction. This, because the humanitarian doctrine seizes upon a fact situation as it existed at the time defendant knew or should have known that plaintiff was in imminent peril. Whatever had transpired from the standpoint of either plaintiff or defendant prior to that time could not affect the rights of the parties thereafter.

Now, it is true that there are certain evidentiary matters for the consideration of a jury in determining (particularly in a case where obliviousness is relied upon to extend the zone of imminent peril) the reasonable appearances to a defendant which may be partially determinative of the time and place a jury finds plaintiff was in imminent peril from defendant's standpoint. And in this connection, a defendant could argue the law of right of way as it might relate to the question of "reasonable appearances" to defendant, particularly in a case wherein "right of way" was a fact issue. But an instruction which is so drawn as to indicate that "right of way" has something to do with the relative rights of plaintiff and defendant after the humanitarian doctrine has seized upon a fact situation is prejudicially erroneous.

Third,—instruction 3 limits the time when plaintiff could have been in imminent peril to the time when he "was proceeding on through the intersection." The time when and the place where one comes into and is in a position of imminent peril is a jury question under the evidence in a particular case. Harrington v. Thompson, Mo. Sup., 243 S.W.2d 519, 525 [8, 9]. Under the evidence in the instant case, a jury reasonably could have found that plaintiff was in imminent peril prior to the time when he "was proceeding on through the intersec-tion." It is true, as defendants suggest, that they were entitled to an instruction submitting the facts considered favorably from their standpoint. However, the difficulty is that no facts were hypothesized in instruction 3, a finding of which by the jury would have justified the direction, as a matter of law, that plaintiff was not in imminent peril until he "was proceeding on through the intersection." Cf. Martin v. Effrein, 359 Mo. 1150, 1155 [7], 225 S.W.2d 775, 779 [11].

The trial court, therefore properly sustained plaintiff's motion for new trial on the ground that he erred in giving instruction 3.

Defendant Bart McKay, owner of the automobile and who is, as noted, the father of defendant John McKay, contends that the trial court erred (for a reason not heretofore discussed) in failing to direct a verdict for him at the close of all the evidence. This contention is based upon the proposition that there was no evidence from which a jury reasonably could find that the son was the agent of the father. The undisputed facts were that defendant Bart McKay was engaged in building a concrete sidewalk at his home. He noted that more cement would be needed to complete the job and noted that his shoes were covered with concrete. Whereupon, his 18-year-old son, John, volunteered to obtain the cement at a hardware store. With the complete acquiescence and approval of his father, defendant John, using his father's automobile, started on this errand and on his way was involved in the instant collision.

Defendant, of course, concedes that the relationship of master and servant may exist between a father and son. And we understand that defendant does not dispute the fact that there was sufficient evidence from which a jury reasonably could find that John was on an errand, the purpose of which was to enable his father to finish a sidewalk at the home maintained by the father for the McKay family. As we understand, defendant father's argument is that, because in going for the cement John "was assisting his father in the work of

making improvements about their home" and because "the father was entitled to the services of his minor unemancipated son living in the home," therefore, John was obligated by law (and not by contract) to perform this service, and that "Since agency arises only out of contract, there was no agency existing here. It was the relationship of parent and child, it was not the relationship of master and servant."

■ We think this position is untenable. We are unable to discern how the facts that the father was entitled to the child's services and that the son may have been obligated by reason of the father-son relationship to render services, affects the decisive fact proposition that the boy was at the time of the instant accident on an errand at the direction of and for the benefit of his father. In other words, the matters urged by defendant Bart McKay could have no decisive significance on the question of whether the son was the father's agent at the time of the accident.

Defendant relies on State ex rel. McCrory v. Bland, 355 Mo. 706, 197 S.W.2d 669, 168 A.L.R. 929. There a wife put a mop on an unlighted stairway over which a laundress fell. Plaintiff, in an attempt to make the husband liable for his wife's negligence, contended that the husband and wife in operating a home were engaged in a joint enterprise. This court held that inasmuch as a joint enterprise could arise only out of contract, and inasmuch as a husband and wife maintained a home as a result of their marital status and not as a result of a specific agreement, there was no joint enterprise. In that case, however, the court said that "In this record there is no showing that the husband, P. H. McCrory, knew that his wife would place the mop in the basement stairway or that her act in doing so was the result of a conference between them. We, therefore, are of the opinion that the trial court erred in overruling appellant P. H. McCrory's motion for a directed verdict." 197 S.W.2d 673 [7]. Indicating that if there had been a conference between the husband and wife about the placing of the mop or an agreement that the mop would be placed in a certain place, the husband's liability might ensue.

But, irrespective of that, there is no similarity in the facts of the McCrory and the instant cases. And there is no principle stated in McCrory which is applicable to the facts of the present case.

■ It is true that agency does not arise solely by reason of the existence of a father-son relationship. 5 Am.Jur., Automobiles, § 360, p. 699. But it is also true that a son who is on an errand for and with the approval of his father, even though the purpose of the errand is to benefit the home which the father maintains for the family, is clearly the father's agent in so far as concerns his negligence in driving a vehicle to accomplish the errand. The instant case, in so far as the correct applicable legal principle is concerned, cannot be distinguished from our case of Foster v. Campbell, 355 Mo. 349, 196 S.W.2d 147. It was there held that a jury question was presented under evidence showing that the wife used her husband's pick-up truck for her own separate purposes but during the same trip obtained, at her husband's request, some gasoline for his use in general farm operation. Certainly the husband in Foster operated his farm for the benefit of his wife in the same sense that the father in the instant case maintained a home for the benefit of his family.

It follows that the order of the trial court is affirmed.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.